Filed 12/4/20  P. v. Lara CA6
(unmodified opinion attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JUAN PACHECO LARA,<br><br>　　　Defendant and Appellant. | H046775<br>(Santa Cruz County<br>　Super. Ct. No. 15CR00784)<br><br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>**[NO CHANGE IN THE**<br><br>**APPELLATE JUDGMENT]** |

BY THE COURT:

It is ordered that the opinion filed on November 20, 2020, be modified as follows:

In the last paragraph on page 26 (which continues on to page 27), delete the sentence that begins with "The jurors might have" and replace it with the following sentence:

> The jurors might have been drawn toward irrelevant issues beyond Doe 1's dishonesty, such as whether Doe 1 consented to the sexual activity with the boys (i.e., acted freely and voluntarily and knowing the nature of the acts) and whether Doe 1 had a proclivity for engaging in sexual activity during the period of the charged acts.

Appellant's petition for rehearing is denied. There is no change in the appellate judgment.

Dated:_____　　　_____
　　　　　　　　　　　　　　　　　　　　　　Danner, J.


　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　Greenwood, P.J.


　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　Grover, J.

Filed 11/20/20  P. v. Lara CA6 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046775 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. 15CR00784) |
| v. | |
| JUAN PACHECO LARA, | |
| Defendant and Appellant. | |

A jury found appellant Juan Pacheco Lara guilty of 15 felony sex crimes and misdemeanor battery committed against two minor victims, and the trial court sentenced him to 129 years to life in prison.  On appeal, Lara claims the trial court erred by excluding evidence of an alleged prior false claim of rape made by one of the victims, imposed an unlawful sentence on one of his lewd or lascivious act convictions, and awarded him insufficient presentence custody credit.  The Attorney General agrees with Lara on his latter two claims.

For the reasons explained below, we reject Lara's claim of error regarding the trial court's exclusion of the alleged prior false claim of rape.  We agree with the parties on Lara's other two claims.  Accordingly, we correct Lara's sentence on the lewd or lascivious act conviction and change the award of presentence custody credit.  With these modifications, we affirm the judgment.

2

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural Background*

On November 26, 2018, the Santa Cruz County District Attorney filed a second amended information (information) charging Lara with 17 sex crimes and child abuse involving two "Jane Doe" minors.[1]  Counts 1 through 10, 17, and 18 alleged sex crimes and child abuse against Jane Doe 1, collectively spanning from October 8, 2007, to October 24, 2014.  Counts 11 through 16 alleged sex crimes against Jane Doe 2, each on or about or between September 29, 2012, and October 21, 2014.

More specifically, counts 1 and 2 alleged forcible lewd or lascivious acts on Jane Doe 1, a child under age 14.  (Pen. Code, §288, subd. (b)(1).)[2]  Counts 3, 7, 8, and 9 alleged aggravated sexual assault of a child, rape of Jane Doe 1, who was under age 14 while Lara was more than 10 years older than her.  (§ 269, subd. (a)(1).)  Count 4 alleged aggravated sexual assault of a child, oral copulation of Jane Doe 1, who was under age 14 while Lara was more than 10 years older than her.  (§ 269, subd. (a)(4).)  Count 5 alleged aggravated sexual assault of a child, sexual penetration of Jane Doe 1, who was under age 14 while Lara was more than 10 years older than her.  (§ 269, subd. (a)(5).)  Count 6 alleged assault with intent to commit rape, sodomy, or oral copulation of Jane Doe 1, who was under age 18.  (§ 220, subd. (a)(2).)  In the alternative to counts 7 through 9, count 10 alleged forcible rape of Jane Doe 1, who was a child of 14 years old or older.  (§ 261, subd. (a)(2).)  Counts 11 through 16 alleged a lewd or lascivious act on Jane Doe 2, a child under age 14.  (§ 288, subd. (a).)  Count 17 alleged a lewd or lascivious act on Jane Doe 1, a child who was 14 years old while Lara was at least 10 years older her.  (§ 288, subd. (c)(1).)  Count 18 alleged child abuse on Jane Doe 1.  (§ 273a, subd. (a).)  The

---

[1] The information referred to the minor victims as "Jane Doe" and "Jane Doe 2." We refer to them, respectively, as "Jane Doe 1" or "Doe 1" and "Jane Doe 2" or "Doe 2." (See Cal. Rules of Court, rule 8.90(b)(4).)

[2] Unspecified statutory references are to the Penal Code.

3

information also alleged that, as to counts 1 through 16, the crimes involved multiple victims and, as to counts 3 through 5, the victim was tied and bound. (§ 667.61, subds. (a), (b) & (e).)

A jury heard evidence in December 2018 on the charges. On December 18, 2018, the jury found Lara guilty as charged on counts 1 through 9 and 12 through 17, and guilty of the lesser included offense of battery (§ 242) on count 18. In addition, the jury found true the multiple-victim allegations.[3] Further, in accord with the trial court's instructions, the jury found Lara not guilty on count 10 because it had found him guilty on at least one of the crimes charged in counts 7 through 9. The jury also found Lara not guilty on count 11.

On June 13, 2019, the trial court sentenced Lara to a total of 129 years to life in prison, comprised of an indeterminate sentence totaling 120 years to life and a consecutive, determinate sentence totaling nine years. The indeterminate sentence included the following: consecutive 15-years-to-life terms on counts 1, 2, 3, 4, 5, 7, 8, and 9; and concurrent 15-years-to-life terms on counts 12, 13, 14, 15, and 16. The indeterminate sentence included seven years on count 6 and two years consecutive on count 17. The trial court also imposed a six-month county jail sentence for the misdemeanor battery conviction on count 18, with six months of credit for time served.

The court gave Lara 1,307 actual days of credit plus 196 days of conduct credit for a total of 1,503 days of presentence credit.

---

[3] The trial court did not instruct the jury on the allegations that Jane Doe 1 was tied and bound during the crimes charged in counts 3 through 5, and the jury did not return a finding on them.

B. *Evidence Presented at Trial*

1. Prosecution Evidence[4]

Jane Doe 1 is the daughter of Lara's girlfriend, Candelaria.[5] Doe 1 was born in October 1999.

Doe 1 lived with her mother, her younger brother E.N., and younger sister N.L. All three children have different fathers, but the same mother, Candelaria. Lara is N.L.'s father. The fathers of Doe 1 and E.N. were not around.

Lara started living with Doe 1 and her family before N.L. was born. Candelaria was often absent from the home because of work and frequently left her children at home alone. Candelaria and Lara had different work schedules, with Lara typically starting work in the afternoon and finishing during the night. Lara spent more time with the children than Candelaria and usually was at their apartment when he was not working.

Jane Doe 2 was born in October 2000. From about September 2012, through December 2014, Doe 2 and her mother, Beatrice, rented a bedroom in a two-bedroom apartment occupied by Doe 1's family. Lara did not reside in the apartment when Beatrice and Doe 2 first moved in, but he visited the apartment in the evening two or three times a week. Later, Lara started living at the apartment. He slept in the living room or the bedroom with Candelaria's children. Beatrice became concerned about Lara's attentiveness toward Doe 1. Doe 1 would sometimes wait up for Lara and they spent time together alone. Lara "would always have [Doe 1] on his lap."

Beatrice did not observe any inappropriate behavior between Lara and her daughter, Doe 2. However, Lara once gave Doe 2 a case for an iPod, which Beatrice told

---

[4] In addition to the evidence described below, the jury heard from an expert on child abuse and child sexual abuse accommodation syndrome. That testimony is not relevant to the issues in this appeal.

[5] We refer to the adult relatives of the victims by their first names to protect the victims' identities. We refer to the minor relatives of the victims by their initials to protect the victims' identities and the minors' privacy interests. (See Cal. Rules of Court, rules 8.90(b)(4), (10) & (11).)

her to return.  Lara also gave Doe 2 rides home from school without Beatrice's permission.  Beatrice told her daughter not to accept the rides.

### a.  Jane Doe 1's Reports of Molestation

In October 2014, Doe 1 was a freshman in high school and turned 15 years old that month.  She told a best friend that she had been sexually abused.  The friend told a teacher.  This disclosure prompted a meeting between Doe 1 and her school principal on October 24, 2014.

Doe 1 reported to the principal that she had been sexually abused in her home a week earlier.  The principal asked Doe 1 to write a statement describing what had happened and contacted the Santa Cruz County Child Protective Services (CPS).  A CPS social worker met with Doe 1 at school that day and contacted the police.

After Doe 1 spoke at school to the social worker and a sheriff's sergeant, Jeffrey Simpson, the social worker took Doe 1 to the sheriff's office for an additional interview. Simpson learned from Doe 1 that she had two siblings, 10-year old E.N. and seven-year old N.L.  Based on Doe 1's present allegations of sexual and physical abuse and some prior information known to CPS, Simpson sought to place the three children into protective custody.[6]  In addition, Simpson and his fellow deputies looked for and discovered Lara inside the family's apartment and took him into custody.

In September 2015, Luz Sanclemente, a Santa Cruz County Department of Family and Child Services social worker, became involved in the case.  She was assigned to find Doe 1 and her siblings a permanent home with someone other than Candelaria or Lara. At that time, a trial on charges against Lara stemming from Doe 1's October 2014 accusations of abuse was scheduled to begin on November 16, 2015.  During her meeting with Sanclemente, Doe 1 for the first time stated that Lara had abused her when her mother was pregnant with N.L.

---

[6] Doe 1 was placed in foster care and did not live with her mother again after October 24, 2014.

In response to the new disclosure of abuse, Santa Cruz County Sheriff's Deputy Ryan Kennedy interviewed Doe 1 on October 6, 2015. Doe 1 told Kennedy about additional sexual abuse. According to Kennedy, Doe 1's demeanor was emotional, withdrawn, upset, and ashamed. She did not talk freely but appeared to need to get the information "off her chest."

### b. Jane Doe 1's Testimony of Abuse by Lara

Doe 1 testified that her first memory of Lara touching her inappropriately was from when she was nine years old. She recalled sleeping one afternoon on the floor of a bedroom in their apartment. Lara was in the room and no one else was home. She "felt movement" "going towards [her] side" and the blankets "unwrapped." Doe 1 did not provide further details about this incident.

Doe 1 said another incident of inappropriate touching occurred when she was "ten or 11 probably." When asked to describe how that incident started, Doe 1 answered: "Basically it's like before my sister was born and my mom was mostly in the hospital a lot. And basically he always ha[d] a routine and try to, like, touch me and try to do stuff to me when there's no one around." Doe 1 explained that Lara touched her bare breasts and bare vagina, typically in the bedroom.

When asked by the prosecutor if she could recall another inappropriate touching, Doe 1 responded "it was, like, my whole middle school basically. It started going more, like, towards intercourse kind of, like, the first time I believe when I was, like, in 6th grade or 7th grade." Doe 1 also testified that Lara first had sexual intercourse with her when she was about nine or 10 years old.

The first incident of sexual intercourse occurred in the bedroom one day after school when no one else was home. Lara kissed Doe's vagina for about five minutes and then put his penis into her vagina. She felt scared, confused, and in pain. Lara did not ever wear a condom when he had sex with her. He told Doe 1 not to tell her mother what had occurred.

Lara continued to have sexual intercourse with Doe 1 after this first incident, in much the same way and "[p]retty much [] randomly whenever he wanted to." Doe 1 testified that she did not "really know" the number of times Lara had intercourse with her, but it occurred for "most of [her] childhood." She agreed it happened at least 10 times and about once a month. When subsequently asked by the prosecutor to estimate how many times Lara had sexual intercourse with her before she turned 14, Doe 1 answered, "Probably three times." Doe 1 said she did not feel she had a choice about whether to engage in sexual intercourse with Lara, and he would use his body weight to hold her down.

After turning 14, Lara rubbed his penis against the outside of Doe 1's vagina "[m]ore than once" and "[b]asically, whenever he had a chance"—but he did not have sexual intercourse with Doe 1 anymore. Lara, however, did attempt to have sexual intercourse with Doe 1 once when she was a freshman, but his attempt was interrupted by Candelaria returning home.

Doe 1 testified that Lara put his mouth on her vagina approximately three times before she was 14 years old. Doe 1 recalled that from the beginning of seventh grade to the eighth grade (when she was 12 or 13 years old), Lara penetrated her vagina with his fingers. He did this before inserting his penis into her in order to "loosen [her] up." She estimated this happened about five times, all before she turned 14.

The last time Lara molested Doe 1 was on October 18, 2014, when she was a freshman in high school.[7] It was nighttime, and Doe 1 was on the living room couch sleeping. Everyone else who lived in the apartment was home at the time. Lara laid down on the couch, facing Doe 1, and held her tightly against himself. He whispered words that she did not understand, put his hand down her shirt, and grabbed her breast. Doe 1 was crying quietly and telling Lara to stop. Lara then forcefully moved his hand to

---

[7] This is the incident that Doe 1 disclosed to her principal and police on October 24, 2014.

her vagina and rubbed her clitoris for about two minutes. Doe 1 continued crying, moved around, and then went to the bathroom and locked the door. At trial, Doe 1 identified photos depicting scratches on her arm caused by Lara while he held her tightly.

Sometime during Doe 1's freshman year (i.e., the 2014/2015 school year), Lara found out that Doe 1 had a boy come over to their apartment. Lara became angry and slapped her. Doe 1 told police about this incident when they interviewed her on October 24, 2014.

During the time that Doe 1 and Doe 2 lived together, Doe 1 told Doe 2 "partially what was happening" to her with Lara but "[n]ot everything." Doe 1 felt she and Doe 2 were "basically sisters." In addition, Doe 1 thought, at first, about telling her mother what Lara was doing to her, but she did not think her mother would believe her. According to Doe 1, Candelaria did not believe her to the present day, had a grudge against her, and had "shamed me from her."

When Doe 1 was interviewed by police in October 2014 about the last incident of abuse, she did not disclose everything that had happened to her over the preceding years because she "was still processing everything that was going on and [she] just wanted to say most of, like, everything that [she] could remember." In September 2015, when Doe 1 spoke to social worker Sanclemente, she described for the first time the long-term abuse she had suffered. Doe 1 testified that she felt comfortable talking to Sanclemente and they "were just really going into detail about -- because she was really curious[,] so going on detail [*sic*] about most of everything." At that time, Doe 1 first realized how early the abuse had started. During the years of abuse, Doe 1 tried to forget about it and move on with her life.

In addition to testifying about the sexual abuse Lara perpetrated on her, Doe 1 testified about an incident of sexual abuse involving Lara and Doe 2. One night, Doe 1 and Doe 2 were on opposite sides of a couch in the living room watching a movie. Lara came home and sat between them. Doe 1 was tired and went to sleep. Doe 1 could hear

a belt unbuckling, pants being taken down, and sucking. Doe 1 "ran to the bathroom, like, crying, like, almost yelling and [she] woke up everybody." She reacted so strongly to what she had heard because she "felt like it was wrong because it was [her] best friend" and she was "scared for her." Doe 1 stayed in the bathroom for "almost an hour until them [*sic*] went to, like, bed." Candelaria tried to talk to Doe 1 about what she had heard, but Doe 1 "couldn't tell her." In addition, the next morning, Lara tried to talk to Doe 1 about the incident as they headed to a flea market, but she "didn't want [to] talk about it." Lara kept trying to apologize to Doe 1 and bought her a beanie at the flea market. Lara always bought things for Doe 1. "It's his way to apologize."

          c. Jane Doe 2's Testimony of Abuse by Lara

In October 2015, Deputy Kennedy and a sheriff's sergeant interviewed Doe 2 in her high school's administration office. During the 15 to 20-minute interview, Doe 2 did not disclose that she had been sexually abused by Lara. Doe 2 answered questions posed to her about Doe 1 and her family and said nothing unusual had happened.

On December 3, 2015, Deputy Kennedy met with Doe 1 and she told him about an incident of sexual abuse involving Doe 2. On December 16, 2015, Kennedy and another deputy interviewed Doe 2 again. During the interview, Doe 2 disclosed sexual abuse by Lara and became upset and withdrawn. According to Kennedy, Doe 2 talked about being sad and how hard it was for her to talk about the abuse. According to Doe 2, she tried, at first, to tell the deputies that nothing had happened. When asked by the prosecutor at trial about the concerns she had about telling the deputies what had occurred, Doe 2 said, "I didn't think they would believe me that anything would have happened. I thought [Lara] was only doing it to me."

Doe 2 recalled that Lara touched her inappropriately for the first time in 2013, when she was 13 years old. She, Doe 1, and Lara had been playfighting in the hallway. After Doe 1 left to take a shower, Lara began touching Doe 2's breasts over her clothing.

10

Upon further questioning at trial, Doe 2 could not remember if Lara's hand had actually touched her breast.

On subsequent occasions, Lara kissed Doe 2 on the lips. In addition, Lara once grabbed Doe 2's hand and put it on his penis over his clothing for a very short time while they were in their apartment. Doe 2 recalled Lara slapping her buttocks twice when she was in the kitchen with him and Doe 1. Sometime later, Doe 2 was sitting on the larger couch in the living room and Lara was sitting beside her. Lara put his hand between Doe 2's thighs and reached toward her vagina, over her clothing.

Lara unsuccessfully tried to put his penis in Doe 2's mouth once, while they were in the living room.

All the sexual abuse Lara perpetrated on Doe 2 occurred when she was 13 years old. Doe 2 did not tell her mother Beatrice about any of the sexual abuse because she did not know how to bring it up or how her mother would react. She thought her mother would think she was lying. Doe 1 never said anything to Doe 2 about what Lara was doing to her, and Doe 2 did not talk to Doe 1 about what Lara was doing to her.

2. Defense Evidence

Lara was the sole defense witness. He testified that he worked two jobs, from 4:00 p.m. until 11:00 p.m. and from 2:00 a.m. until 9:00 or 11:00 a.m. He fed Jane Doe 1, E.N., and N.L., took them to school, and picked them up.

One day in October 2014, Lara confronted Doe 1 about having had a boy over to the apartment while she was supposed to be watching her siblings. Doe 1 was not honest about the boy's visit. During the confrontation, Lara scolded Doe 1 and smacked her once in the mouth. That evening, while Doe 1 was on the couch crying about having had her phone taken away as a punishment, Lara embraced her and told her it was going to be alright. Doe 1 told Lara she did not like him. Lara denied scratching Doe 1's arm intentionally or reaching under her shirt and touching her breast. He also denied touching her buttocks or vagina.

11

Lara denied that he ever had sexual intercourse with Doe 1, touched her vagina, digitally penetrated her, or put his mouth on her vagina. He testified that he never told Doe 1 she should not to tell her mother about such events.

Lara denied squeezing or grabbing Doe 2's breasts while they were playfighting. He also denied smacking Doe 1's and Doe 2's buttocks. He denied ever kissing Doe 2 or putting her hand on his penis. He said he never tried to put Doe 2's mouth on his penis while sitting on the couch. He denied that he put his hand on Doe 2's thigh and tried to touch her vagina. On the night that Doe 1 locked herself in the bathroom, Lara did not unbuckle his belt, unzip his fly, or have oral sex with Doe 2.

On cross-examination, Lara testified that he had been living with Candelaria when N.L. was born in 2007. He continued living with the family until October 2010. Between 2010 and 2012, he visited and supervised the children, cooked, and cleaned. He moved back into the apartment after Beatrice and Doe 2 had moved in. He acknowledged that he frequently bought gifts for Candelaria's children and said he had purchased a phone case for Doe 1, who did not want it and then gave it to Doe 2. He said his relationship with Doe 1 was like that of a father and closer than the relationship Doe 1 had with Candelaria. Lara acknowledged telling a police detective he was afraid that one day he would be accused of molesting Doe 1. Lara asserted, however, that he had made that statement after the detective had "put the idea in [his] mind."

### 3. Prosecution Rebuttal

On October 24, 2014, a sheriff's detective sergeant, Roy Morales, interviewed Lara about the October 18, 2014 incident involving Doe 1. Lara told Detective Morales that he was the disciplinarian in the family and Candelaria was bothered that he spent more time with Doe 1 than N.L. Lara said that on the night Doe 1 was laying on the couch, he got behind her on his knees, wrapped his arm around her, and held her tightly to comfort her. He said he frequently held Doe 1 so tightly that she could not move away. Lara admitted to placing his hand under Doe 1's shirt and said his hand touched

12

her stomach and might have touched her breast.  He also said he might have bruised Doe 1 while holding her.  Lara seemed bothered when the interview was focused on the couch incident and tried to talk about how well he got along with Doe 1.  Lara said that on the morning after the incident, Doe 1 came into his bedroom, straddled him as he lay in bed, and apologized for the previous night's argument.  Lara caressed her hair and told her it was okay.

Lara initially denied striking Doe 1.  But when confronted during the interview with the fact that Doe 1 had a bruise on her cheek, Lara said the injury could have happened when he was trying to get something from Doe 1, and later he admitted he had slapped her on the other side of her face.

## II.  DISCUSSION

A. *Exclusion of Evidence Regarding Alleged Prior False Claim of Rape*

Lara claims the trial court erred and violated his constitutional rights to due process and confrontation when it excluded evidence of a prior allegedly false claim of rape made by Jane Doe 1 involving two unrelated minors.

1.  <u>Additional Background</u>

Pretrial, Lara filed a motion in limine pursuant to Evidence Code sections 780, 782, and 1103 seeking permission to cross-examine Doe 1 about her prior sexual conduct and present impeaching witnesses regarding an alleged false accusation of rape that Doe 1 had made in December 2013.  In the motion, Lara stated his intent to call Kelli Freitas, a sheriff's detective who had interviewed Doe 1 on December 18, 2013.  The prosecution opposed the introduction of any evidence about Doe 1's prior sexual conduct or any statements Doe 1 made to Detective Freitas.  The trial court heard argument on the motion over several days, issued multiple tentative rulings, and conducted an Evidence Code section 402 hearing at which Doe 1 testified before it entirely precluded use of the evidence in Lara's trial.

13

a. Jane Doe 1's Interview with Detective Freitas

On Wednesday, December 18, 2013, Lara brought Doe 1 to the sheriff's office for an interview. Doe 1 was fourteen years old at the time. Detective Freitas began the interview by asking Doe 1 whether Lara had informed her of the topic for the interview. Doe 1 said Lara only told her that she "had to talk to a person about personal information." Doe 1 also acknowledged knowing that Lara had talked to a deputy sheriff about things he (Lara) had found on her cellphone. Doe 1 agreed to be honest with Freitas and relayed the following information.

On the Friday before the interview, Doe 1's boyfriend, T., sent her an electronic message urging her to have a "threesome."[8] Doe 1 said " 'No.' " T. included his friend M. on his messages and said he would appear at Doe 1's home on Saturday. Doe 1 again told him " 'No.' " The boys also asked Doe 1 to send them photos of herself nude. Doe 1 replied, " 'No just leave me alone.' "

On Saturday morning around 10:00 a.m., T. and M. showed up outside Doe 1's bedroom window asking to be let in. There were no adults at the apartment at that time. Doe 1 said no and told the boys to leave. Nevertheless, they climbed in through the window. They refused to leave and said they just wanted to talk to her. While they talked, "they started touching [her]." Doe 1 told them to leave her alone and "ran to the door. They locked it."

When T. started touching her, Doe 1 said " 'No' " and started crying in the corner of the room. T. told her it was going to be "fine" and "quick." When Doe 1 told T. she did not want to do " 'this,' " he did not answer her and would "just kiss [her] right away and like start touching [her]. But like [she] told him to stop and he wouldn't stop." She left the room crying and spoke to her sister.

---

[8] We refer to the two unrelated minors involved in this incident by their first initials, T. and M., to protect the identity of Doe 1 and the minors' privacy interests. (See Cal. Rules of Court, rules 8.90(b)(4), (10) & (11).)

Later, Doe 1 returned to the bedroom. The two boys were in her bed and told her to come in. She said no, and T. grabbed her hand and said, " 'Come on.' " She said, " 'No.' " But they would not leave her alone. T. "put [her] in the bed, like grabbed [her] and put [her] in the bed." Doe 1 told him to leave her alone.

T. then "just started like having sex with [her]." T. was on top of her and M. had his hands on her "arms holding them." "And then when [T.] was done it was [M.]'s turn," but they did not have sex. When asked how it was decided that T. was done, Doe 1 said, "I told him to stop and all of a sudden he stopped." The sex had lasted about 10 minutes. Doe 1 had "told [T.] to stop many times. Like he wouldn't listen. But after the last, 'Stop,' he stopped it."

At around 11:30 a.m., Lara called Doe 1, and T. and M. left. Later, Lara asked Doe 1 whether T. had been at their home and she said no. Lara "got really mad" at her for lying. She "didn't want to tell him really bad." Lara took Doe 1's cellphone and showed her some things he found on it, including proof that she had sent T. a nude photo of herself.

Upon further questioning by Detective Freitas, Doe 1 made several statements that contradicted the account of the incident she had given earlier in the interview. For example, Doe 1 stated that M. did not touch her that morning. Doe 1 also said that she did not tell T. to stop having sex with her a couple of different times.

When Detective Freitas asked Doe 1 to "again walk through" the entire incident, Doe 1 stated that T. had stopped having sex with her in response to her only request to do so, and he never forced her to have sex with him. When asked if she eventually agreed to have sex with T. that morning, Doe 1 said "Yes." Doe 1 reiterated that "[M.] never did anything," but he had lied in subsequent text messages about having had sex with Doe 1 and having had a threesome. Lara showed those text messages to Doe 1 and she cried because "that actually hurt [her] a lot." Doe 1 told Lara she did not have sex with M., but Lara did not believe her. She also told Lara that T. "[d]id not force [her]." Doe 1

15

confirmed that she had previously sent a nude photo of herself to T., and he forwarded it to his friends.

### b. Trial Court's First Tentative Ruling

When the in limine motion was first considered, defense counsel argued that the defense case rested on Doe 1's alleged propensity to "lash[] out and falsely accuse[] others" "in the face of having been caught[] behaving badly on her own." Counsel maintained that the December 2013 situation paralleled the October 2014 situation (when Doe 1 again had been caught by Lara having a boy at the apartment). Counsel further asserted "the lies that bear on her credibility and the fact that the context is sex, we believe strengthen[] our position that it should come in and that it should [be] allowed to be explored by the jury because of the issues of false accusations and what we believe begat those false accusations."

The prosecutor argued initially that the prejudice from the allegations Doe 1 made to Detective Freitas "far outweighs any probative value as to Jane Doe 1's credibility." The prosecutor acknowledged that in the interview with Freitas Doe 1 had made contradictory statements about the boys' knowledge about whether she consented to having sex with them. The prosecutor urged the trial court to consider the context in which the interview occurred, in that Lara brought Doe 1 to the sheriff's office for the interview and was very angry and upset. The prosecutor further maintained there was "a factual issue with the idea that this was even a false rape accusation to begin with."

At a subsequent proceeding, after the trial court had reviewed the interview transcript and audio recording, the court tentatively ruled against Lara. The court explained that the December 2013 incident was "not a situation where Jane Doe 1 claim[ed] someone had abused her and then reported that to law enforcement." Rather, in the court's judgment, Lara suspected sexual activity by Doe 1, confronted her about it, and took her to the sheriff's department, seemingly "against her desires," where she was "confronted by a complete stranger and asked to talk about these very personal, intimate

16

facts." The court acknowledged that Doe 1 "absolutely does give misleading statements, false statements" to Freitas. "But during the course of the interview, [Doe 1] absolutely clarifies everything. Indicates that any sexual contact that she had was consensual." The court noted "Freitas is leading in most of her questions, in a great deal of the interview." The court contrasted the present case with a "typical case" where a person tells police she or he has been sexually assaulted and later it is revealed that the person had lied.

Further, the court opined that admitting information about the December 2013 incident would greatly prejudice the People's case, noting that the jury would "[c]ertainly [look at it] with disfavor." The court said it did not find the defense position (i.e., that Doe 1 made a prior false accusation of sexual assault and was now doing the same against Lara) to be "sufficiently probative" to admit the information. The court explained that, in making its ruling, it was "not weighing Jane Doe 1's credibility" because it knew from the recording of the interview "exactly what she said." Rather, the court was analyzing the evidence under Evidence Code section 352 and found the evidence was not "sufficiently probative to put [] in front of the jury."

After it ruled, the trial court indicated a willingness to reconsider its ruling if the defense could establish that, because of the December 2013 incident, Jane Doe 1 subsequently "came up with a plan to frame [Lara] and make false allegations" against him.

### c. Lara's Supplement and the Trial Court's Further Tentative Rulings

Lara filed a supplement to his original in limine motion. In the supplement, defense counsel proffered that Lara could testify that, among other things, when he confronted Doe 1 about whether the two boys had been at the apartment in December 2013, Doe 1 told him the boys forced her to have sex against her will. Doe 1 used the word " 'rape' " in that description and told Lara that it caused her to lose her virginity. According to Lara, Doe 1 went willingly to the sheriff's department to report what had occurred. Thereafter, Doe 1 had no explanation for why she had lied to either Lara and

17

Candelaria or the police. As a result of this incident, Lara and Candelaria took Doe 1's cellphone away and grounded her, which sparked an altercation between Candelaria and Doe 1. Subsequently, in early October 2014, Jane Doe 1 had another altercation with Candelaria after Doe 1 "had her screens taken from her." In addition, on a Friday in October 2014, Lara discovered that Doe 1 had had another boy over without adult supervision. Doe 1 denied it. Doe 1's siblings and Beatrice, however, informed Lara that a boy had been inside Doe 1's bedroom. Doe 1 then admitted to Lara that a boy had come over and that they had been intimate.

At a subsequent proceeding, defense counsel reiterated that the 2013 and 2014 incidents were relevant because they were factually similar, in that, when Doe 1 had boys at the apartment against her parents' rules and was confronted about it, "she respond[ed] in each incident by falsely accusing someone of molesting her." When the trial court said it failed to see how the two situations "are connected to show [Doe 1 is] biased against [Lara] or [had] motivation for her to lie." Defense counsel replied that the situations were "not necessarily connected" or "a series of activity." Rather, according to defense counsel, "the real importance to [the defense] case is the credibility concern, not the motive or the bias, it's the credibility."

The trial court noted that, regarding Doe 1's credibility, the defense could likely offer "other incidents where she lied about things" and asked, "Why bring in the two that concern underage sex?" The trial court again tentatively ruled against Lara: "The Court's tentative at this point would be to preclude the defense from admitting the incident from October 2014, finding no relevance whatsoever to that situation. [¶] And a tentative of not allowing the defense to introduce the 2013 November [*sic*] incident either. [¶] However, I'm not making a final decision until after I hear the testimony of the alleged victim, [Jane Doe 1]." The court also said an Evidence Code section 402 hearing may be needed regarding the defense assertions that Doe 1 willingly went to the sheriff's office and had told Lara that she was forced to have sex and lost her virginity.

18

The court concluded, "I want to hear from her. Maybe do a [Evidence Code section] 402 on these specific issues. And then see whatever other evidence would be coming in."

          d. Evidence Code Section 402 Hearing

After the trial had begun, Doe 1 testified outside the presence of the jury in an evidentiary hearing about the December 2013 incident. Doe 1 said that when T. and M. came to her home, she told them they were not allowed to enter but "they forced their selves [*sic*] in through the window that was cracked." The boys wanted to talk to her and "wanted to be involved in something that [she] didn't want to do." Doe 1 testified that, ultimately, she had sexual intercourse with both boys that day.

When Lara came home after the boys had left, he suspected someone had been there. Doe 1 lied to Lara and told him "no" when he asked about whether the boys had been there. Lara became "pissed off" after learning of Doe 1's falsehood. He took Doe 1's phone and began texting the boys to find out what had happened, because Doe 1 "was not telling him what happened." On the Sunday after the incident, Lara approached Doe 1 and questioned her about a picture he found on her phone. Lara asked why she sent it and "just kept questioning" her in an "assertive kind of [] way." Doe 1 did not tell Lara "full details" of what had happened with T. and M. But she did tell him they had had sex. Doe 1 did not discuss with Lara whether the sex was consensual.

Lara told Doe 1 that he was going to make a report. Later, he told Doe 1 she was "going to talk to some people." Lara took Doe 1 to the police station but did not tell her why or where they were going—though he might have "told her he want[ed] [her] to describe what happened with [M.] and [T.]." She did not want to make a report to the police and "just wanted to forget about it."

Talking to the detective was awkward for Doe 1. She did not want to be there and felt "really scattered" and "uncomfortable." She acknowledged that, during the interview, she first said she had not wanted to participate in several of the sexual acts with the boys. But at the end of the interview, she said that the sexual acts were

consensual.  When asked why she had changed her statement from having been forced to engage in the acts to having not been forced, Doe 1 explained that she "really didn't know the difference" or "what was going on" at the time and "just told [the police] everything."

Doe 1 testified that she did not lie to Detective Freitas.  Doe 1 explained further that she "did not know anything about consent."  She also testified that she thinks her statement changed "because [she] didn't want [the boys] getting in trouble" for "the actions[,] so that's probably why [she] said that."  Her current opinion was that what happened between her and the boys was forced, because she "felt peer pressure at the time" and had told the boys that she did not want them to come to her house, but she "didn't know what to do at the time."  After telling T. she was okay with having sex but not in front of M., she "[j]ust [went] along with whatever was happening."  She said that she never told Detective Freitas or Lara that she had been "raped."

e.  Trial Court's Final Ruling

After the defense confirmed it would not present any evidence at the evidentiary hearing, the trial court stated another tentative ruling:  "So the Court's ruling will be to preclude the defense from getting into that interview for the same reasons that I had indicated previously."  The court then informed the parties it would hear arguments after the lunch recess but wanted to let them know in advance what it was thinking.

During the arguments, the trial court stated that Evidence Code section "787 preludes specific instances of dishonesty or conduct."  The court explained that questions about an instance of dishonesty would be proper impeachment "if it goes to some other relevant issues."  The court noted, for example, that if "[Doe 1] made up this story" (presumably the present allegations) because she was mad at Lara for having caught her with boys in 2013, and was mad at him again in 2014 and wanted "to get revenge" after he caught her with a boy for a second time, "that's a different parallel track that I don't say there's some relevance to that [*sic*].  But that doesn't go to her credibility and her

20

reputation for honesty in the community." After defense counsel said he did not have "a good-faith basis" that Doe 1 harbored a revenge motivation, the court said, "So for now I'll preclude these areas with this witness."

Defense counsel then argued further that Doe 1's interview with Detective Freitas was "a documented, demonstrated instance of . . . a prior false allegation" which counsel asserted, "in a case of this nature[,] is important, relevant, probative." Counsel suggested that his cross-examination of Doe 1 regarding her statements could be "sanitiz[ed]" and done without "get[ting] into the sexual nature of the allegations."

The trial court again ruled against Lara. The court "conclud[ed] that this was not a false rape accusation at all." The court noted that Doe 1 "did not wish to report [the incident] to the authorities" and "never claimed anybody broke down her window and forced their way in or forcibly raped her." "She clearly did not want to go along with the sexual conduct, but did it nonetheless. How strong was her opposition is a question of debate." The court explained that lack of consent can exist regardless whether the victim fought against the perpetrator or said no, and the boys did not obtain Doe 1's consent before engaging in sexual conduct.

Further, the trial court explained that if the "sexual contact" is removed from the "allegations" concerning the December 2013 and October 2014 incidents, they had "no relevance" and would simply be instances in which Doe 1 "got caught lying to Mr. Lara [but that] isn't how you would impeach her." The court reiterated it was "not seeing the connection" to Doe 1's "bias or [a] reason why she sought revenge by making false accusations against Mr. Lara." The court ultimately precluded the defense from "get[ting] into the December [2013] incident in its entirety" as well as the "later lying" about the other boy in 2014. The court noted, however, that it was "fair game" "[u]nder [section] 787 of the Evidence Code" for witnesses who knew Doe 1 to testify about her "credibility, her character, [or] her reputation for honesty in the community."

21

### f. New Trial Motion

After trial, Lara filed a new trial motion asserting the trial court erred by finding the proposed evidence of false allegations irrelevant and deprived Lara of his right to due process. The trial court denied the motion, reiterating that Doe 1 had not made "a false allegation." The court explained that, though Doe 1 had lied to Lara when he confronted her, "when she spoke to law enforcement, although dodging for some period of time, [she] did in fact tell law enforcement that nothing illegal had happened. She was not forced. [¶] And based on that the Court did not find that to be sufficiently relevant to bring it in front of the jury."

### 2. Legal Principles

All relevant evidence is admissible except as otherwise provided by statute. (Evid. Code, §§ 350, 351). Relevant evidence includes "evidence relevant to the credibility of a witness . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see also Evid. Code, § 780.)

Generally, past misconduct involving moral turpitude or dishonesty is admissible to impeach a witness in a criminal trial. (*People v. Wheeler* (1992) 4 Cal.4th 284, 288, 295–296 (*Wheeler*); *People v. Dalton* (2019) 7 Cal.5th 166, 214 (*Dalton*).) In particular, "[e]vidence of a prior false report of molestation or rape is relevant to the credibility of the victim." (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1424 (*Miranda*); see also *People v. Franklin* (1994) 25 Cal.App.4th 328, 335 (*Franklin*); *People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 598–599 (*Burrell-Hart*); Evid. Code, § 1103, subd. (a)(1).)

When presented with a prior false report, "[e]ven though the content of the statement has to do with sexual conduct, the sexual conduct is not the fact from which the jury is asked to draw an inference about the witness's credibility. The jury is asked to draw an inference about the witness's credibility from the fact that she stated as true something that was false. The fact that a witness stated something that is not true as true

22

is relevant on the witness's credibility whether she fabricated the [current charged] incident or fantasized it." (*Franklin*, *supra*, 25 Cal.App.4th at p. 335.) However, "[p]rior rape complaints do not reflect on credibility unless proven to be false." (*Miranda*, *supra*, 199 Cal.App.4th at p. 1424; see also *People v. Winbush* (2017) 2 Cal.5th 402, 469.) "The [probative] value of the evidence as impeachment depends upon proof that the prior charges were false." (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1097, disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919; see also *People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457–1458 (*Tidwell*).)

Evidence Code section 352 provides the trial court discretion to exclude otherwise admissible evidence, "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " '[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 301; see also *Tidwell*, *supra*, 163 Cal.App.4th at p. 1457; *Miranda*, *supra*, 199 Cal.App.4th at p. 1424.)

Further, a defendant's "right to cross-examination is not a matter of 'absolute right.' Although . . . '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' [citation]. Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown* (2003) 31 Cal.4th 518, 545.) "The trial court retains wide latitude to restrict repetitive, prejudicial, confusing, or marginally relevant cross-examination.

23

Unless the defendant can show that the prohibited cross-examination would have created a significantly different impression of the witness's credibility, the trial court's exercise of discretion to restrict cross-examination does not violate the constitutional right of confrontation." (*People v. Sánchez* (2016) 63 Cal.4th 411, 450–451 [citing, among other cases, *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680]; see also *Olden v. Kentucky* (1988) 488 U.S. 227, 232.)

" 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 821.) Thus, "[a]lthough the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.)

Lara asserts the trial court's exclusion of the evidence related to the 2013 interview infringed his constitutional right to confrontation, and appellate courts generally apply the independent standard of review to such claims. (See *People v. Seijas* (2005) 36 Cal.4th 291, 304.) A trial court's evidentiary ruling under Evidence Code section 352 is reviewed for abuse of discretion. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1130.) Further, we review a trial court's factual findings for substantial evidence. (*People v. Breaux* (1991) 1 Cal.4th 281, 293; *People v. Conner* (1983) 34 Cal.3d 141, 149.) An appellate court will not reverse a trial court's ruling excluding evidence "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

3. Analysis

Lara argues there "was substantial evidence from which a reasonable jury could have found that [Doe 1] had made a prior false rape allegation." Relatedly, he argues that the trial court abused its discretion when it found that Doe 1 had not made a false claim

of rape because that finding is not supported by substantial evidence.  He asserts that the evidence shows Doe 1 "first described [to Detective Freitas] forcible sexual activity that occurred after she repeatedly objected by saying, 'No.' "  Then, Doe 1 told Freitas that the sex was not forced.  He maintains that "[u]nforced sexual intercourse would not be forcible rape."

Further, Lara claims the evidence that Doe 1 "had falsely alleged that [T.] and [M.] raped her was highly relevant to her credibility as proof of a character trait of making false accusations of sexual assault."  He asserts that "[u]ndue consumption of time was not an issue" here and the "evidence could not reasonably have been found to be substantially more prejudicial than probative, unduly confusing or misleading to the jury.  Therefore, although the evidence on the subject was conflicting, the trial court abused its discretion by excluding it."  In addition, he claims the trial court's ruling violated his constitutional rights to due process by precluding him from presenting a complete defense and to confront the witnesses against him by precluding meaningful cross-examination.  Finally, Lara claims the exclusion of the prior false rape allegation was prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 24 and *People v. Watson* (1956) 46 Cal.2d 818, 836–837.

We are not persuaded under either the independent or abuse of discretion standard of review that the trial court erred by excluding the evidence related to Doe 1's statements in 2013 to Detective Freitas.  As we explain below, the proposed impeachment was only marginally relevant to Doe 1's credibility, and the probative value of the evidence was substantially outweighed by the significant danger that the jurors would be prejudiced, confused, or misled by it.

Before explaining our conclusion, we address two of Lara's contentions on appeal. Lara asserts that, "[c]ontrary to the trial court's comments, a character trait of making false rape or sexual assault allegations could properly be proved by specific instances of such dishonest conduct, despite Evidence Code section 787's purported prohibition of

25

such evidence." Lara is correct. To the extent the trial court believed specific instances of dishonesty could not be used to impeach Doe 1 unless they were otherwise related to bias or improper motive, the trial court misstated the law. (See *Dalton*, *supra*, 7 Cal.5th at p. 214; *Wheeler*, *supra*, 4 Cal.4th at pp. 292, 295–296.)

Nevertheless, the trial court addressed and considered the probative value of the proposed impeachment separate from bias or motive when it stated its initial tentative ruling. Further, "[a] 'ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*People v. Dawkins* (2014) 230 Cal.App.4th 991, 1004.) Under these circumstances, we discern no reason to conclude the trial court abused its discretion under Evidence Code section 352 or otherwise violated Lara's constitutional rights because it seemingly misunderstood the law regarding the use of specific instances of dishonesty to attack the credibility of a witness.

In addition, Lara asserts that there was sufficient evidence for the jury to conclude that Doe 1 had made a prior false rape allegation and the trial court's finding that no false rape accusation occurred was not supported by substantial evidence. We acknowledge that Doe 1 made several conflicting statements about the December 2013 incident to Detective Freitas. In the interview with Freitas, Doe 1 initially accused her peers T. and M. of committing nonconsensual, forcible sexual acts against her. By the end of the interview, however, Doe 1 materially altered those allegations and described the sexual acts as unforced. She also made statements to the trial court during the Evidence Code section 402 hearing that conflicted with what she had said to Freitas. For example, during her hearing testimony, Doe 1 said she had sexual intercourse with both T. and M., but during her interview with Freitas, she made clear that she did not have sex with M. In our judgment, some of Doe 1's statements are irreconcilable and could be evidence of a character trait for dishonesty. Nevertheless, we need not reach the question whether

26

substantial evidence supports the trial court's finding that Doe 1 had not made a false rape accusation against T. or M.

We assume arguendo that Doe 1 was dishonest when speaking to Detective Freitas and made false accusations against T. and M. regarding their sexual conduct toward her, but we conclude this evidence had only marginal probative value under the circumstances here. Doe 1 made her statements about the December 2013 incident to Freitas after having been confronted by Lara about her interactions with the boys. The trial court found that she did not report the incident to the police on her own; it was Lara who reached out to the sheriff's department. There is substantial evidence supporting that conclusion.

During the interview, after Detective Freitas questioned Doe 1's truthfulness about how the sexual activity had happened, Doe 1 altered some of her descriptions of the incident. Contrary to Lara's asserted theory at trial of the relevance of this evidence, Doe 1's conduct before and during the interview does not demonstrate a tendency to make up and stick to a false accusatory story in order to "lash out" or "falsely accuse" an innocent person. Further, the context of the incident with the boys and Doe 1's subsequent accusations against them is not like that of the charged crimes. Doe 1's dishonesty regarding the December 2013 incident related to sexual activity with peers, not molestation by an adult. Doe 1's accusation against Lara did not arise in the context of her having been caught engaging in sexual activity with him. This difference reduces the tendency of the impeachment evidence to prove that Doe 1 was falsely accusing Lara in conformity with her prior dishonest behavior. (See *Miranda*, *supra*, 199 Cal.App.4th at pp. 1425–1426; cf. *Burrell-Hart*, *supra*, 192 Cal.App.3d at pp. 597–598.)

In addition, there was a significant probability that the impeachment evidence would have created a substantial danger of undue prejudice, confusion, or misdirection of the jury. Doe 1's dishonest statements about sexual activity with her peers would have diverted the jury's attention to a different incident bearing no direct relationship to the

27

charged crimes. The jurors might have been drawn toward irrelevant issues such as consent and whether Doe 1 had a proclivity for engaging in sexual activity during the period of the charged acts. Our own review of Doe 1's statements to Detective Freitas reveals that her statements about what happened are confusing and difficult to parse. Thus, in contrast to its marginal relevance, the proposed impeachment regarding the December 2013 incident posed a substantial risk of undue prejudice, confusion, and misleading the jury.

For the same reasons, Lara was not denied his right to confront Doe 1 or present a defense. Lara cross-examined Doe 1 rigorously. Lara challenged her with inconsistent statements and her failure to disclose the full extent of the alleged molestation until almost a year after her initial accusation against Lara. Doe 1's trial testimony was, at times, difficult to follow and nonresponsive to the questions asked, and Lara highlighted Doe 1's inconsistency to the jury. The jurors here were provided with ample information to evaluate Doe 1's credibility, and any impeachment of her based on the purportedly false accusations against T. and M. would have been of marginal benefit in the jury's assessment of whether she was lying about Lara's conduct towards her.

In sum, we conclude the trial court did not err when it exercised its discretion to prohibit Lara from cross-examining Doe 1 or otherwise presenting impeachment evidence about the December 2013 incident. The court properly weighed the potential for undue prejudice, confusion, and misleading of the jury against any probative value and reasonably declined to permit evidence on this collateral incident. In addition, having conducted an independent review of the trial court's ruling, we discern no violation of Lara's confrontation or due process rights.

B. *Sentence on Count 17*

Lara asserts the trial court erred when it imposed a full consecutive middle-term sentence of two years on count 17 for his violation of section 288, subdivision (c)(1), a lewd or lascivious act on a child of 14 or 15 years. Lara contends that his conviction and

28

attendant sentence on count 17 are not governed by section 667.6, subdivisions (c) and (d). Instead, his sentence should have been imposed under section 1170.1, subdivision (a), which provides that subordinate terms must be one-third of the middle term prescribed for that felony. Lara maintains that, under section 1170.1, he should have been sentenced to eight months on count 17, not two years. The Attorney General agrees with Lara, and we concur.

Section 667.6 applies to defendants convicted of certain forcible sex offenses. (*People v. Sasser* (2015) 61 Cal.4th 1, 9.) The offense charged in count 17—section 288, subdivision (c)(1)—is not one of those offenses. (See § 667.6, subd. (e); see also *People v. Pelayo* (1999) 69 Cal.App.4th 115, 125.) In addition, Lara was not convicted of an offense listed in section 667.6, subdivision (e), as against Jane Doe 2 on the same occasion he committed the offense charged in count 17 against Jane Doe 1. (See *People v. Goodliffe* (2009) 177 Cal.App.4th 723, 730.) Thus, Lara's consecutive sentence on count 17 must be imposed pursuant to section 1170.1. Accordingly, we will modify Lara's sentence on count 17 to eight months and direct the trial court to issue a new sentencing minute order and amend the abstract of judgment to reflect the eight-month sentence on count 17. (See *In re Harris* (1993) 5 Cal.4th 813, 842 ["An appellate court may 'correct a sentence that is not authorized by law whenever the error comes to the attention of the court.' "]; see also *People v. Smith* (2001) 24 Cal.4th 849, 854.)

C. *Presentence Credits*

Lara claims, and the Attorney General agrees, that the trial court miscalculated Lara's presentence custody credit. The parties are correct.

"A defendant is entitled to actual custody credit for 'all days of custody' in county jail . . ., including partial days. [Citations.] Calculation of custody credit begins on the day of arrest and continues through the day of sentencing." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; § 2900.5, subd. (a).) In addition, when a defendant is convicted of certain felonies (including some of the felonies here), his or her conduct

credits are limited to 15 percent of the actual days in custody. (§§ 2933.1, 667.5, subd. (c)(6).) An issue regarding miscalculation of presentence custody credit is not forfeited by a failure to object at sentencing and may be corrected on appeal. (See *People v. Guillen* (1994) 25 Cal.App.4th 756, 764; see also *People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8; *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1464.)

Here, the trial court awarded Lara 1,307 days of credit for time in custody. The probation report indicates, and the parties agree, that by the time of Lara's sentencing, his actual time in custody was 1,314 days—from November 18, 2014, to and including November 21, 2014, and from November 12, 2015, to and including June 13, 2019. Lara, therefore, is entitled to seven additional days of actual custody credit. The miscalculation of Lara's actual time in custody resulted in an erroneous award of 196 days of conduct credit and 1,503 days of total presentence credit. Based on the 1,314 days of Lara's actual custody, the correct conduct credit award is 197 days (i.e., 15 percent of the actual custody). Hence, the correct total presentence custody credit here is 1,511 days. We will order the sentencing minute order and abstract of judgment modified to reflect the correct credits.

### III. DISPOSITION

The judgment is modified to correct the sentence on count 17 to a term of eight months and to award a total of 1,511 days in presentence custody credit (1,314 actual days, plus 197 days conduct credit). Upon issuance of our remittitur, the trial court is directed to issue a new sentencing minute order and an amended abstract of judgment to reflect the judgment as modified and to send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. The clerk of this court is directed to send a copy of this opinion and the remittitur to the Department of Corrections and Rehabilitation. (Cal. Rules of Court, rule 8.272(d)(2).) As modified, the judgment is affirmed.

_____

Danner, J.

WE CONCUR:


_____

Greenwood, P.J.


_____

Grover, J.


**H046775**
***People v. Lara***